FIRST TRUST CO. v. ILLINOIS CENT. R. CO. SAME v. CHICAGO & N. W. RY. CO. SAME v. NORTHERN PACIFIC RY. CO.

(Circuit Court of Appeals, Eighth Circuit. August 12, 1918.)

Nos. 5062–5064.

1. COURTS ☞347—FEDERAL PRACTICE—INTERVENTION—AMENDMENT.
    Where, after decree foreclosing a trust deed on the property of a railroad company, interveners who asserted that their claims were entitled to priority filed intervening petitions under Equity Rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii), they cannot thereafter amend the petitions and attack the validity of the trust deed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. RECEIVERS ☞157—PRIORITY OF CLAIMS.

   The holders of bonds secured by a trust deed on railroad property *held* not to have operated the property during the time that the indebtedness due interline carriers arose, so as to give such carriers priority on the ground that the indebtedness was that of the bondholders.

3. RECEIVERS ☞159—PRIORITY—DIVERSION OF INCOME.

   Where no interest was paid on bonds secured by a trust deed on the property of a railroad company during the period when the claims of interveners based on interline freight, etc., arose, interveners are not entitled to priority under the usual six months' rule; there having been no diversion of income.

Appeal from the District Court of the United States for the Northern District of Iowa; Henry T. Reed, Judge.

Bill by the First Trust Company, as trustee, against the Crooked Creek Railroad & Coal Company, in which the Chicago & Northwestern Railway Company, the Illinois Central Railroad Company, and the Northern Pacific Railway Company separately intervened. From decrees for the interveners (243 Fed. 450), complainant appeals. Reversed in part, and in part affirmed.

D. M. Kelleher, of Ft. Dodge, Iowa (B. J. Price and Clarence M. Hanson, both of Ft. Dodge, Iowa, on the brief), for appellant.

James C. Davis, of Chicago, Ill., for appellees Chicago & N. W. Ry. Co. and Northern Pac. Ry. Co.

F. H. Helsell and Charles A. Helsell, both of Ft. Dodge, Iowa, for appellee Illinois Cent. R. Co.

Before SANBORN and CARLAND, Circuit Judges, and BOOTH, District Judge.

CARLAND, Circuit Judge. The appellant in each of the above-mentioned cases on July 21, 1915, commenced an action against the Crooked Creek Railroad & Coal Company to foreclose a trust deed executed by the railroad company to the predecessor of the appellant, namely, the Milwaukee Trust Company, on January 3, 1911, to secure the payment of 328 bonds executed by the railroad company on the previous day. On February 8, 1916, a decree of foreclosure in the usual form was entered in said action. The decree established the validity of the lien of the trust deed as of January 3, 1911, on the property described therein, found the amount due on the bonds which the trust deed secured to be $116,500 as principal and $6,524.12 as interest, and ordered a sale of the property described in the trust deed. The property conveyed by the trust deed was a line of railroad extending from Webster City, Iowa, to Lehigh, Iowa, a distance of about 18 miles, together with appurtenant property, including certain real estate holdings. The decree also contained the following paragraph:

"It is ordered, adjudged, and decreed that in the sale and conveyance of the property described in the said indenture of trust and first mortgage and in this decree described, the purchaser thereof shall take and receive his conveyance pursuant to the sale herein ordered, subject to the requirements of this decree that the demands of all persons who have or may file claims and petitions of intervention and whose demands shall be determined to be prior

and paramount to the lien of the mortgage herein foreclosed, shall be paid by such purchaser or purchasers into the registry of the court upon the determination by the court that such claims have priority to said mortgage. The purpose and effect of this provision of this decree shall be to prevent this decree from operating as a defense to any claims or demands against the said Crooked Creek Railroad & Coal Company, which demands are entitled to priority to the lien of the said mortgage, and such prior rights, if any there are, as the same may be finally adjudicated and determined, are reserved to such preferred claimants."

The mortgaged property was sold pursuant to the decree of foreclosure March 16, 1916, to one Walter R. Dyer, for $112,300.00. On April 29, 1916, the sale was confirmed. On October 11, 1915, November 8, 1915, and April 24, 1916, the Chicago & Northwestern Railway Company, the Illinois Central Railroad Company, and the Northern Pacific Railway Company, respectively, by leave of court, filed their intervening petitions in the foreclosure suit, praying that certain indebtedness of the railroad company to said petitioners be allowed and declared to be liens on the mortgaged property prior to the lien of the mortgage. On April 25, 1916, after the decree of foreclosure had been entered, the Chicago & Northwestern Railway Company was allowed to file an amended petition in intervention. One of the amendments to the petition set forth facts which it was claimed showed that the trust deed was ultra vires and void. On April 26, 1916, after the decree of foreclosure had been entered, the Illinois Central Railroad Company amended its petition, by leave of court, by setting forth the same facts as the Chicago & Northwestern Railway Company with reference to the invalidity of the trust deed. In regard to the intervening petition of the Northern Pacific Railway Company, it was stipulated by counsel that the evidence and testimony taken in behalf of either the Illinois Central Railroad Company or the Chicago & Northwestern Railway Company might be offered, read, and received upon behalf of the Northern Pacific Railway Company, and its petition was treated as amended accordingly. The three petitions in intervention were answered by appellant, and testimony was taken. At the time the testimony was taken, and at the hearing, appellant objected to the introduction of any evidence tending to impeach the validity of the trust deed, as those matters were res judicata by reason of the decree of foreclosure. On June 18, 1917, the trial court entered decrees on the three intervening petitions, which established the claims of the three interveners as liens on the proceeds resulting from the sale of the mortgaged property, paramount and superior to the lien of the trust deed, and also provided that if the claims were not paid within 60 days the mortgaged property should be again sold for the purpose of paying the claims. The decrees entered did not specify the grounds upon which the priority of the claims was based. The trial court made no findings of fact except by way of certain statements found in a memorandum opinion which the court filed at the time the decrees were entered and except the findings in the decrees themselves. The only matters discussed in the memorandum of opinion as a reason for holding the claims of the interveners prior to the lien of the mortgage was the invalidity of the trust deed for want of consideration, and the fact that it appeared to the trial

court that during the time the indebtedness of the several interveners arose the bondholders operated the railroad. The usual grounds for declaring preferences as to claims originating within six months prior to the appointment of a receiver were not mentioned. The reservation in the decree above quoted was made with reference to the intervening petitions then on file, and, whatever effect may be claimed for it, it did recognize the lien of the trust deed; otherwise there could have been no foreclosure.

[1] It remains to be determined, therefore, whether, in view of the decrees and the status of interveners, the intervening petitions filed for the purpose of securing priority in the payment of claims could be amended so as to be for all practical purposes creditors' bills, seeking to subject a fund to the payment of the indebtedness mentioned. We are of the opinion that, in view of the decrees already entered and the status of interveners, they could not attack the validity of the trust deed as ultra vires. It was the trust deed which had produced the fund in court. The property was not sold generally subject to such liens as might exist thereon, but was sold because of the lien of the trust deed which was foreclosed. The interveners could not claim an interest in a fund which the trust deed had produced and at the same time wreck the whole foreclosure proceeding.. Equity Rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii) provides:

"Any one claiming an interest in the litigation may at any time be permitted to assert his right by intervention, but the intervention shall be in subordination to, and in recognition of, the propriety of the main proceeding."

This rule fixes the general status of an intervener, and, with the decree of foreclosure, precluded the interveners from asserting a preference to the lien of the trust deed by showing that such lien was void. An attack by the interveners which destroyed the trust deed, would not establish priority, because priority recognizes the lien of the trust deed, and the interveners did not occupy the position of judgment creditors. We conclude therefore that the priority of interveners' claims could not be based on the invalidity of the trust deed.

[2] We come now to the other proposition discussed by the trial court, in regard to which it seemed to be of the opinion that the bondholders were operating the railroad at the time the indebtedness of the interveners arose. We do not think the evidence sustains the charge made. In the agreement of August 18, 1910, between George E. Burnham and Charles L. Burnham, president and secretary of the Crooked Creek Railroad '& Coal Company, representing the stockholders of said company, and Homer Loring, the latter agreed to: (1) Electrify the Crooked Creek Railroad & Coal Company's properties. (2) Build an extension and effect a junction with the Ft. Dodge, Des Moines & Southern Road. It was also provided in this agreement that the Burnhams might designate a majority of the directors of the Crooked Creek Railroad & Coal Company, its successor or assigns, and two of the general officers, to wit, president and secretary, and that Loring would elect or cause to be elected such of the directors and officers so nominated.

The evidence in the record shows that the last provision of the contract was carried out by Loring, but it also clearly appears that the bondholders did not operate the Crooked Creek Railroad during the time the indebtedness of the interveners arose. We think the evidence establishes the fact without much dispute that Loring, through the Ft. Dodge, Des Moines & Southern Railway, operated the road during the time the interveners' indebtedness arose, so that it cannot be said on the record that the indebtedness of the Crooked Creek Road to the interveners is the indebtedness of the bondholders. It is suggested that the bondholders were also the stockholders. We do not think that under the contracts in evidence this can be true; but, whatever may be the fact, the bondholders in fact did not operate the road. So we find no reason for holding the claims of interveners superior to the mortgage on this ground.

[3] The next contention is that there was a diversion of income which ought to have been applied to the payment of the claims of interveners. This diversion of income is said to have arisen because the corporation took money from income that ought to have gone to the payment of interveners' claims and used it to pay interest on the bonds. Of the amounts found due to the several interveners, the following amounts arose within six months prior to the appointment of the receiver: Chicago & Northwestern $3,929.36; Illinois Central, $1,264.95; Northern Pacific, $256.56.

The indebtedness due to the interveners arose from many different causes. The amount due for each cause is not readily found in the record, but the following is a sample of the items which appear in the accounts: Interline freight, lease claims, overcharge claims, apparatus, per diem, water furnished engines, rentals, miscellaneous, loss, damages, etc. These are not items generally classed as operating expense, and we do not decide that question, but conceding that they are, there was no interest paid during 1915 on the bonds, so that there was no diversion of income during the time the indebtedness arose. Therefore we do not find any ground for establishing the amounts which arose within the six months' period as preferences. In the case of Chicago & A. R. Co. v. U. S. & Mexican Trust Co., 225 Fed. 940, 141 C. C. A. 64, Judge Sanborn, in delivering the opinion of this court, laid down the following rules of law governing the matter of preferences in cases like the one under consideration and cited all the cases existing at that time upon the subject:

"It is true that a mortgagee of the property and income of an operating railroad company impliedly agrees that the current expenses of the ordinary operation of the railroad for wages, supplies, materials, and such necessities of operation for six months before the impounding of the income for its benefit, may be first paid out of the gross income of operation, before that net income arises which the mortgagee's lien holds fast, and that a court of equity administering railroad property in a foreclosure suit may prefer unpaid claims for such current expenses incurred within six months before the impounding of the income to the claims of bondholders secured by a prior mortgage in its distribution of the surplus income of the property, and that if income has been diverted from the payment of such current expenses, leaving some of them unpaid, to the payment of other debts of the mortgagor not in this preferential class, the court may restore from the proceeds of the corpus of

the property the amount thus diverted and apply it to the payment of such current expenses. But if there has been no diversion there can be no restoration, and the amount of the restoration cannot exceed the amount of the diversion."

The discussions of counsel on both sides of the questions involved on this appeal have taken a wide range; but, in view of the record, we are of the opinion that we cannot go into matters of general equity as we might do on a general creditor's bill.

It results from what we have said that the decrees below, in so far as they decree a priority in favor of the claims of interveners over the lien of the trust deed, must be reversed, but otherwise affirmed; and it is so ordered.

